**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION** |
| | : | **No. 14-520-5** |
| **RAPHAEL HUNT IRVING** | : | |
| | : | |

**McHUGH, J.**                                                                                   **July 27, 2018**

<u>**MEMORANDUM**</u>

Defendant Raphael Hunt Irving was found guilty by a jury of drug-related conspiracy and attempt charges in the culmination of an extensive, multi-defendant investigation. He now challenges the sufficiency and constitutionality of the underlying indictment on several grounds, the admission of certain evidence under the Fourth Amendment and *Maryland v. Buie*, 494 U.S. 325 (1990), and his pending felon-in-possession charge, 18 U.S.C. § 922(g)(1), under the Second Amendment.

Hunt Irving's felon-in-possession charge was severed from the rest pending the Third Circuit's decision in *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (*en banc*), a Second Amendment challenge to the law, and is now ripe for decision. He argues that § 922(g)(1) is unconstitutional as applied to him because it bars him from gun ownership based only on a "non-serious" crime. His challenge highlights the serious implications of what the Third Circuit left unresolved in the splintered *Binderup* decision: what constitutes a "serious crime" for Second Amendment purposes when a felon challenges the applicability of § 922(g)(1). When he was charged, Hunt Irving had a single, non-violent felony conviction—a conviction that, when subjected to the various tests advanced in *Binderup* would lead to different

1

outcomes in his case. Indeed, as set forth below, the Defendant essentially relies upon the concurring opinion in *Binderup* as the principal basis for his argument. But the legal test Hunt Irving asks me to apply in support of his Second Amendment challenge did not command a majority of the Court, and his Motion to Dismiss the Indictment, together with his other motions, will be denied.

## I. Background

Following a wiretap and indictment, federal agents obtained arrest warrants for Defendant Raphael Hunt Irving and several co-defendants who allegedly conspired to purchase cocaine for distribution. The agents executed the warrants at the same time on September 26, 2014. Before dawn, a group of eight to ten agents arrived to Hunt Irving's residence, a two-story building that housed his funeral home business on the first floor and his residence on the second. According to the agents' testimony, they knocked loudly and announced their presence. A few minutes later, Hunt Irving came to a second floor window and asked what was going on. The agents identified themselves as police and told him to open up. What happened next is disputed. DEA Agent Glenn testified that the agents waited another "five to seven minutes," then breached the door using a crow bar and battering ram. Hr'g Tr. 24:5–7, 25:3–9, May 24, 2017 [hereinafter "Hr'g Tr. A"]. Hunt Irving disputes this amount of time and says he came downstairs without delay, but before he got to the door the officers had forcibly entered. Hr'g Tr. 5:24–6:7, May 30, 2017 [hereinafter "Hr'g Tr. B"]. There is no dispute that when the agents broke the door in, Hunt Irving was standing right inside, unarmed, about ten feet from the door. The agents ordered Hunt Irving to the ground and handcuffed him. The testifying agents agreed that he was cooperative and did not resist arrest.

Agent Glenn, the team leader, asked Hunt Irving if there were any other people, or any

weapons, in the home. Hr'g Tr. A 27:9–28:4. Meanwhile, the team of agents immediately began a "protective sweep of the entire building." *Id.* Defendant replied that there was no one else there, and said he had a hunting rifle upstairs in his bedroom closet. Agents testified that Hunt Irving "hesitated" before answering the weapons question. Hr'g Tr. B 95:11–16. The agents found an AK47-style semi-automatic rifle in the bedroom closet where Hunt Irving had indicated. When agents suggested to Hunt Irving that the gun was not a hunting rifle, he responded that he used it to hunt wild boars or hogs. Hr'g Tr. B 98:17–25. After the sweep was completed—about fifteen minutes later—Agent Glenn read Hunt Irving his *Miranda* rights and the agents asked for his consent to a search of the property. He agreed. In that subsequent, more intensive search, agents found a digital scale, a large amount of cash (about $15,000), and a second gun (a handgun). Only the cash and scale would later be entered as evidence in Hunt Irving's drug conspiracy trial.[1]

Defendant was eventually charged in a Third Superseding Indictment [hereinafter "the Indictment"] with multiple drug distribution conspiracies (Counts One, Seven, and Eight), attempted drug possession (Count Two), and a § 922(g)(1) violation for being a felon in possession of a firearm (Count Six) [hereinafter "felon-in-possession"]. As to the felon-in-possession charge, Hunt Irving does not dispute that he owned the rifle and handgun the agents found in his residence. He likewise concedes that he had prior felony convictions; four years before his arrest in this case he had pled guilty to two counts of Tampering with State Records. Those charges arose from an investigation into the financial practices of his funeral business in

---

[1] The guns—the rifle that Hunt Irving had directed agents to and the handgun they later found in the search—were not admitted as evidence because Hunt Irving's gun-related charge under § 922(g)(1) was severed from the other charges. *See* Gov.'s Mot. Sever 4, ECF No. 167 (seeking to sever Count Six—the felon-in-possession charge—from the first phase of trial until after the Supreme Court's ruling on the "as-applied" challenge to § 922(g)(1) in *Binderup*). Thus, Defendant had the benefit of trying his case without the jury learning that he possessed these weapons.

its interactions with the state's Victim Compensation Assistance Program (VCAP), which reimburses victims and their families for crime-related losses, including murder victims' funeral expenses. The investigation uncovered four instances over the course of seven years in which Hunt Irving had overbilled the state for funeral costs or did not pass on to the family the full refund he received from the state. Because of these claims, he was charged with Tampering with Public Documents with intent to defraud, 18 Pa. Const. Stat. § 4911. In Pennsylvania, this crime is designated a third-degree felony, *id.*, punishable by up to seven years in prison, 18 Pa. Const. Stat. § 1103. Pursuant to a plea agreement, Hunt Irving received two years' probation with no jail time and had to pay restitution of $7,125 ($3,325 to one family, $2,638 to another, and $1,162 to the VCAP), donate $500 to Dauphin County, and complete 250 hours of community service in Chester County.

Before trial, Hunt Irving moved to dismiss the felon-in-possession charge, arguing that it did not sufficiently allege that the guns had affected interstate commerce, and alternatively, that the charge was unconstitutional based on *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011),[2] and the district court's holding in *Binderup v. Holder*, 2014 WL 4764424, at *31 (E.D. Pa. 2014). *See* Mot. Dismiss Indictment, ECF No. 114. Because the parties agreed to sever that charge for trial, a ruling on that motion was deferred.

At trial in June 2017, the jury found Hunt Irving guilty of two conspiracies (Counts One and Eight) and attempt (Count Two), and not guilty on Count Seven, relating to a 2012 conspiracy. Jury Verdict Form, ECF No. 200; Order, ECF No. 204. In September 2016, the Third Circuit affirmed the District Court's *Binderup* decision in a plurality opinion, *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336 ["*Binderup*"], and last year the Supreme Court denied *certiorari*,

---

[2] As explained below, *Barton* was overruled in part by the Third Circuit's decision in *Binderup*, 836 F.3d at 339 n.1, 350, where ten of the fifteen judges explicitly stated that they would overrule some or all of *Barton*.

*Sessions v. Binderup*, 137 S. Ct. 2323 (2017).  Following those decisions, Hunt Irving, through new counsel, has filed a Motion for a New Trial and/or Arrest of Judgment, ECF No. 209 [hereinafter Def.'s Mot. New Trial], reasserting his *Binderup* challenge to the felon-in-possession charge, *id.* ¶ 1, and asserting several other arguments, including that:

- the Court erred in its pre-trial denial of his motion to suppress evidence seized from his residence, *see* Order, ECF No. 181, and Mem., ECF No. 211, both because the "protective sweep" of the second floor was unsupported by articulable facts, Def.'s Mot. New Trial ¶ 2, and because his subsequent consent to search was not voluntary, *id.* ¶ 3;

- the conspiracy counts (One and Eight) in the Indictment were multiplicitous, ¶ 4; and

- the jury's verdict was contrary to the weight of the evidence and a new trial is appropriate in the interest of justice, ¶¶ 5–8, 10, 11.

*Id.*; Def.'s Suppl. Memo, ECF No. 217 [hereinafter "Def.'s Mot."]; Def.'s Sur-Reply, ECF No. 231.[3]  Defendant does not reassert the interstate commerce argument articulated in his pre-trial Motion to Dismiss the Indictment, but I nevertheless address it as it is technically still pending.

For the reasons set forth below, I conclude that even if one assumes that the sweep of the second floor violated the Fourth Amendment, it did not taint Hunt Irving's subsequent consent to search, and his pre-trial motion to suppress the evidence seized from his building was therefore properly denied.  His Second Amendment challenge also fails, as the Third Circuit's decision in *Binderup* yielded no new test for as-applied challenges to § 922(g)(1), and the felon-in-possession charge is clearly lawful under pre-*Binderup* law.  Hunt Irving's remaining arguments fail because the indictment adequately alleged that his guns affected interstate commerce, his multiplicity challenge is both waived and meritless, and the jury's verdict was far from a miscarriage of justice.

---

[3] Hunt Irving's original Motion listed other grounds for a new trial related to the propriety of the government's expert witness, *see* Def.'s Mot. New Trial ¶¶ 9, 10, but he made no mention of those arguments in any briefing, so I consider those challenges dropped.

**II. Fourth Amendment Challenge:  Sweep of Second Floor and Consent Search**

Defendant Hunt Irving asserts that the agents' initial protective sweep of the second floor was unreasonable under the Fourth Amendment, and thus tainted his subsequent consent to a search of the building, during which agents found the digital scale and cash, both admitted at trial, and the handgun. Def.'s Mot. 4–5 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). I previously ruled that Hunt Irving voluntarily consented to the search, and rejected his testimony to the contrary as lacking credibility. Suppress. Mem., ECF No. 211.  The current motion advances a different basis for suppression.

 Preliminarily, the government contends that the issue is waived. Gov.'s Resp. 4–5, ECF No. 230 (citing Suppress. Mem., ECF No. 211).  Hunt Irving disagrees, and reserves the right to assert ineffective assistance of counsel in the event that the issue is deemed waived.  I therefore first address this threshold issue of waiver.

At the suppression hearing, counsel's argument touched, but did not focus on, the permissibility of the security sweep.  Hunt Irving's trial counsel—different from his current counsel—made an argument similar to the one Hunt Irving now makes, asserting that the sweep would have occurred regardless of the circumstances:  ". . . if you look at the situation, the search in its totality . . . it's clear that these agents were going to search, Your Honor.  They searched the second floor, they searched the funeral parlor.  They searched the entire building initially." Hr'g Tr. B 131:21–132:2 (repeated words omitted).  Responding to the Court's question about whether it was reasonable for the agents, once Hunt Irving told them he had a rifle in the house, "for purposes of safety, to take that step of securing the weapon," trial counsel replied:  "I think they can secure the weapon, but I don't think that that gives them probable cause to do anything else.  I mean I think the fact they're saying, hey, we discovered a weapon in the house and

because we discovered the weapon, we now have some reason to search for what?" Hr'g Tr. B 138:5–139:16.

Based on this transcript, Hunt Irving's trial counsel certainly conceded the validity of the officers securing the rifle for safety purposes. I see no indication, however, that defense counsel conceded his more general point—that a broader security sweep of the second floor was impermissible. Hr'g Tr. B 131:21–132:2, 139:8. I therefore find that the issue of the constitutionality of the sweep of the second floor in general is not waived. Nonetheless, the motion to suppress lacks merit.

Moving to the merits of the Fourth Amendment challenge, the parties agree that *Maryland v. Buie*, 494 U.S. 325 (1990), provides the relevant standard for the agents' sweep of Hunt Irving's funeral home and residence. *Buie* analyzed an exception to the general rule that a residence cannot be searched without probable cause and identified the permissible bounds of a warrantless search of a residence incident to arrest:

> [I]ncident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which . . . would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

494 U.S. at 331, 334. The *Buie* Court called this a "protective sweep," emphasizing that it must be "aimed at protecting the arresting officers, if justified by the circumstances." *Id.* Even where articulable facts exist suggesting that officers are in danger of attack, the Court cautioned that the sweep must be "quick and limited," *id.* at 331. Stated differently:

> [A protective sweep] is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart

the premises.

*Id.* at 335–36.

The Supreme Court made clear that "[t]he type of search we authorize today . . . is decidedly not automatic, but may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." 494 U.S. at 336.

Based on these principles, Hunt Irving argues that the agents proceeded with their sweep simply as a matter of routine, without the articulable, reasonable suspicion required by law.[4] The Government in turn seeks to portray Hunt Irving's delay in answering the door and his admission that there was a weapon present as justifying the sweep. The record is not well-developed, in part because the argument Defendant advances now is significantly different in emphasis from the theory advanced at the suppression hearing. But there is no need to reach the merits of the *Buie* argument, or further develop the record,[5] because any violation of its precepts would still not entitle Hunt Irving to relief, for two reasons.

First, the scale, the cash, and the handgun were not recovered as part of the agents' sweep. Agents recovered only the AK47-style assault rifle, which Hunt Irving does not seek to

---

[4] For example, Agent Schmidt testified that, when the agents breached the door and took Hunt Irving into custody, "at the same time[,] we started clearing . . . making the property safe to make sure that . . . no offense to the defendant but we're not going to believe just because they say there's nobody in the house. We're not going to believe that. We're going to actually do a complete sweep of the property to clear each room—bathrooms, closets to make sure that there's nobody—no threats inside the residence." Hr'g Tr. B 94:18–95:20.

[5] When the agents came to Hunt Irving's funeral home, they certainly knew he was wanted as part of a multi-defendant drug trafficking ring. The scope of the investigation, the sheer number of arrest warrants issued, and the precision with which law enforcement executed those warrants—across five states and within seconds of each other—suggest that the Government perceived these suspects as a threat. But the specific knowledge of the team arresting Hunt Irving was not elicited at the suppression hearing.

suppress, in the bedroom closet to which he had directed the agents. [6]  Second, and of greater

importance, the defense fails to make a convincing argument that Hunt Irving's consent was

tainted by the protective sweep even if it was unwarranted.

In contrast to his well-reasoned *Buie* analysis, Hunt Irving's taint argument is wholly

conclusory, set forth in a single sentence:  "The impropriety of the scope of the search tainted the

subsequent consent to search the property." *See* Def.'s Mot. 5 (citing *Wong Sun*, 371 U.S. 471

(1963)).  In *Wong Sun*, the Supreme Court analyzed the reach of the exclusionary rule—what

evidence discovered as a result of a Fourth Amendment violation should be excluded as "fruit of

the poisonous tree." 371 U.S. at 484–85.  The Court concluded that the operative inquiry is

whether the evidence "has been come at by exploitation of that illegality or instead by means

sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (citing *Nardone v.

United States*, 308 U.S. 338, 341 (1939)).  A decade later, when analyzing the admissibility of

inculpatory statements made in the wake of a Fourth Amendment violation, the Supreme Court

clarified that "*Wong Sun* requires not merely that the statement meet the Fifth Amendment

standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint."

*Brown v. Illinois*, 422 U.S. 590, 602 (1975).  Whether an inculpatory statement—or in the case

of Hunt Irving, a consent to search—"is the product of free will" must be answered on the facts

of each case, and no single fact is dispositive. *See id.* at 603.  A *Miranda* warning may be an

important factor but does not alone purge the taint. *Id.*

Hunt Irving's rote citation of *Wong Sun*, with no argument as to why it would mandate

_____

[6] The fact that this other evidence was not initially recovered weighs in favor of the Government's
position that the protective sweep was limited and not more intrusive than necessary to ensure the agents'
safety.  It bears mention that *Buie* is rooted in a recognition of the need to allow some intrusion inside a
defendant's home for purposes of protection:  "[U]nlike an encounter on the street or along a highway, an
in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'  An ambush in a
confined setting of unknown configuration is more to be feared than it is in open, more familiar
surroundings." 494 U.S. at 333.

exclusion of the evidence found in the consent search, leaves the Court to speculate as to his theory. As a threshold matter, because there is no challenge to the seizure of the rifle, the only evidence gathered before Defendant consented to the search, it is difficult to discern why the sweep would have had any bearing on Defendant's decision to consent to a full search. Hunt Irving does not argue that the second floor sweep was a "but-for" cause of his consent to search, let alone that it was the critical element in his decision to consent. He agreed to a search knowing that the agents had thus far seized only his rifle, something he freely admitted owning, with the further knowledge that a handgun, digital scale, and cash remained undiscovered after the protective sweep. Even if one were to posit that seizure of the rifle was unlawful, and might have undermined Hunt Irving's resolve to resist discovery of the handgun, the fact that he was already facing a firearms offense would not have changed his incentive to avoid discovery of drug-related evidence such as the scale and cash. I have already held that his consent was voluntary, motivated by his desire to limit the impact of his arrest and the search on his funeral business, especially the funerals scheduled for that day. Suppress. Mem. 2, ECF No. 211 (crediting the testimony of Agent Schmidt, who "explained to Defendant that agents would need to secure his property while waiting for a search warrant to issue—a practical reality of law enforcement that would have motivated Defendant to consent to a search"). The protective sweep of the second floor does not alter that analysis.

I conclude that that the sweep is both legally and factually irrelevant to Defendant's consent to the search, rendering the scale, cash and handgun admissible in evidence.

## III. Second Amendment Challenge: *Binderup*

Having concluded that the basis for Hunt Irving's felon-in-possession charge is sound— that evidence of his possession of both guns is admissible—I next consider his argument that the

felon-in-possession law, § 922(g)(1), is unconstitutional as applied to him.  The parties'

arguments on this point, emanating from the Third Circuit's fragmented *Binderup* decision,

present a serious analytical challenge.  That is so because although *Binderup* opened the door to

felons challenging the enforcement of § 922(g)(1), a precedent-shattering result, it yielded no

new test for challenges like this one. *See* 836 F.3d at 357 n.2.[7]  I will review the tests endorsed

by the various factions of the *en banc* panel in *Binderup*, including the test proposed by the

concurrence, on which Hunt Irving relies.  Ultimately, however, there was no majority in

*Binderup* as to what constitutes a "serious crime"—and under prior surviving precedent,

Defendant's challenge must fail.

Section 922(g)(1) makes it a crime for people who have been convicted of a crime

"punishable by imprisonment for a term exceeding one year" to possess a firearm.  Although it is

commonly referred to as the "felon-in-possession" rule, the law applies to felonies and

misdemeanors alike, except that it excludes misdemeanors punishable by two years' or less

imprisonment. § 921(a)(20)(B).  Here, the parties agree that Hunt Irving's guilty plea to

Tampering with Public Records with an intent to defraud, which Pennsylvania's legislature

classifies as a third-degree felony punishable by up to seven years' imprisonment, falls within

§ 922(g)(1), making it a federal crime for him to possess a firearm.

In *Binderup*, the Third Circuit considered civil challenges to the constitutionality of the

felon-in-possession law as applied to two Pennsylvania men who wanted to own guns but could

not legally do so under § 922(g)(1). 836 F.3d at 340.  The first individual, Binderup, had pled

guilty some twenty years earlier to corrupting a minor, a misdemeanor in Pennsylvania, after he

had sex with his employee, whom he knew was 17, when he was 41. *Id.*  The crime was

---

[7] Judge Hardiman's concurrence accurately noted that "the outcome-determinative sections [of Judge Ambro's "plurality" opinion] are supported by only three judges." *Id.*

punishable by up to five years' imprisonment, but he received a sentence of three years' probation and restitution. He had no subsequent convictions. The second plaintiff was Suarez, who pled guilty in 1990 to carrying a handgun without a license after he was caught during a DUI stop with an unlicensed gun and two "speed loaders," devices designed to reduce the time and effort it takes to reload a firearm. *Id.* The crime, a misdemeanor in Maryland, carried a maximum sentence of three years, but Suarez received a six-month suspended sentence with a small fine. His only other conviction was eight years later, for driving under the influence, a misdemeanor that did not fall within the scope of § 922(g)(1). *Id.*

The Third Circuit's *en banc* panel reached a narrow majority holding, eight votes to seven, that the felon-in-possession law violated the Second Amendment rights of both plaintiffs. *Id.* at 339. There was loose agreement by a "separate majority," counting votes from the plurality and dissent,[8] on certain aspects of an as-applied analysis. *See id.* That group, ten judges from two decisional camps, reached a majority holding that *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010),[9] continues to provide the governing framework for Second Amendment claims, including as-applied challenges to § 922(g)(1). *Binderup*, 836 F.3d at 356.[10] But no guiding rationale or test surfaced in *Binderup*, principally because none of the three decisional

---

[8] The various opinions and subsections in *Binderup* do not lend themselves to easy classification, but here I refer to the opinion Judge Ambro authored as the plurality, to Judge Hardiman's as the concurrence, and to Judge Fuentes's as the dissent. I recognize that these labels are imperfect, because sections of Judge Ambro's opinion do not, in fact, represent a plurality, and certain reasoning in the dissent overlaps with the true plurality, but nevertheless use these terms for simplicity's sake.

[9] *Marzzarella* rejected an as-applied challenge to § 922(k), which criminalizes the possession of firearms with obliterated serial numbers. 614 F.3d at 89.

[10] The "vote tally" demonstrating a majority consensus on this point is actually set forth in a footnote at the very beginning of the *Binderup* opinion, 836 F.3d at 339 n.1. The same group of judges agreed that *United States v. Barton,* 633 F.3d 168 (3d Cir. 2011) was at least partly overruled: "To the extent *Barton* holds that people convicted of serious crimes may regain their lost Second Amendment rights after not posing a threat to society for a period of time, it is overruled." 836 F.3d at 349. The concurrence, in contrast, rooted its analysis in *Barton*: "Most relevant to these appeals is our analysis of *Barton*'s as-applied challenge to § 922(g)(1)." *Id.* at 360.

camps could agree on a key component of the *Marzzarella* test: what constitutes a "serious crime"?

*Marzzarella*'s first step requires a § 922(g)(1) challenger to prove that the law burdens conduct protected by the Second Amendment, which, under *Binderup*, he may only do by showing that "he was not previously convicted of a serious crime." *Binderup*, 836 F.3d at 353, 356 (citing *Marzzarella*, 614 F.3d at 89). If the challenger can make this showing, the burden shifts to the government in the second step to show that the law survives intermediate scrutiny. *Id.* Clearly, *Binderup*'s three divergent methods for identifying a "serious crime" complicate the first step. I review and consider each in turn.

In a section of Judge Ambro's plurality opinion joined only by two other judges, he writes that some crimes facially within § 922(g)(1)'s scope may be "so tame and technical" that they are insufficient to justify the firearm ban. *Id.* at 350. As proof that such a showing is possible, Judge Ambro points to a footnote in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that describes the felon-in-possession law as "presumptively lawful" and attaches significance to the Supreme Court's use of the word presumption, asserting that presumptions are rebuttable unless explicitly "flagged as irrebuttable." *Id.* at 349–50 (quoting *Heller*, 554 U.S. at 627 n.26, and citing *Barton*, 633 F.3d at 174, for the notion that "a person who did not commit a serious crime retains his Second Amendment Rights"). The plurality posits that, although "there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," the relevant considerations are: (1) the state legislature's classification of the offense as a misdemeanor or felony; (2) whether the elements of the crime include actual or attempted violence[11]; (3) the actual sentence imposed; and (4) any "cross-jurisdictional

---

[11] In the plurality's formulation of the rule, this is a categorical analysis that focuses on the elements of the criminal statute rather than on "the way it actually was committed." *Id*. at 352 & n.4.

consensus" as to the seriousness of the crime. *Id.* at 351–53.

Applying these factors to Hunt Irving's underlying state felony, the "state classification" factor would likely doom his challenge, even though his crime was non-violent and he received no jail time. That is so because Judge Ambro's formulation considers the state legislature's classification and maximum sentence a "powerful expression" of its belief in the seriousness (or lack thereof) of a crime. *Id.* at 351. Thus, although Judge Ambro acknowledged that some state misdemeanors can rise to the level of being "serious," conversely, his opinion all but foreclosed the possibility that a state *felony* could be non-serious. *Id.* at 353 n.6. On its face, this approach adopted by the plurality in *Binderup* came close to limiting the ability to bring an as-applied challenge exclusively to state-law misdemeanants. But the plurality went on to raise a "remote" possibility that a state-law felon could succeed in a challenge, even as it emphasized that the challenger's burden would be "extraordinarily high—and perhaps even insurmountable." Judge Ambro's approach thus invites Hunt Irving to argue that his prior conviction was not "serious" because his crime was non-violent, he received no jail time, and there is no strong cross-jurisdictional consensus.[12] And although the plurality garnered only three votes, as set forth below, it remains relevant because of the lack of a majority consensus as to what constitutes a serious crime.

The other votes for preservation of the *Marzzarella* test came from the dissent, which concluded that any challenge to the application of § 922(g)(1) is easily resolved by a bright line test: all crimes currently within the law's scope are "serious." The dissenting judges—the largest single bloc on this question—posited that "*Heller* itself tells us that felons are disqualified from exercising their Second Amendment rights," and that as-applied challenges to the current law are

---

[12] Thirty-five states have criminalized such conduct, and thus the cross-jurisdictional consideration weighs in favor of seriousness. *See* Gov.'s Resp. 15 n.10, ECF No. 216 (citing John F. Decker, *The Varying Parameters of Obstruction of Justice in American Criminal Law*, 65 La. L. Rev. 85–97 (2004)).

therefore impermissible. *Id.* at 388.[13]  Under this approach, there is no need to analyze the prior conviction (as the plurality would require), because such an analysis is legally irrelevant. Necessarily, by the *Binderup* dissent's formulation of the test, Hunt Irving's challenge would also fail, because he cannot contest that his prior crime is covered by § 922(g)(1).

In contrast, the concurrence in *Binderup*, supported by five judges, approached the definition of "serious crime" by reference to *Barton*. *Id.* at 366.  *Barton* sought to carve out an exception to the absolute bar against felon gun possession where the challenger could "present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Binderup*, 836 F.3d at 362 (citing *Barton*, 633 F.3d at 174 (3d Cir. 2011)).  The concurrence would permit such a challenger to meet this burden in at least two ways.  First, a "felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen."  Second, "a court might find that a felon whose crime of conviction [no matter what it is] is decades-old poses no continuing threat to society." *Id.* (citing *Barton*, 633 F.3d at 174).  Significantly, the concurrence argues that any justification for limiting the right to bear arms must have a "historical pedigree," *id.* at 366, and it later defines the sole historical justification for limiting access to firearms as "people who have demonstrated that they are likely to commit violent crimes.," *id.* at 370.  The *Binderup* concurrence found that both plaintiffs in that case qualified for relief because their convictions were nonviolent, and each had "a job, a family, and a clean record" dating back nearly twenty years. *Id.* at 376–78.

Not surprisingly, it is principally the analysis of the concurring judges in *Binderup* that

---

[13] The dissent addressed the Supreme Court's use of the phrase "presumptively lawful," to which the plurality and concurrence attached controlling significance, emphasizing that it appears only as a footnote—specifically a footnote to the Court's broad, seemingly unconditional statement in the body of the opinion that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at 394 (citing *Heller*, 554 U.S at 626–27 & n.26).

underpins Hunt Irving's argument, in which he asserts that he is "no more dangerous than a typical law-abiding citizen and poses no continuing threat to society." Def.'s Mot. Dismiss Indictment 10.  Defendant's prior conviction, though not "decades-old," was unquestionably non-violent, and there is no other evidence of violent propensity.  He runs a successful business, has a daughter whom he helps support, and until he was indicted for the drug conspiracy here, had a clean record before and after his records tampering conviction—all evidence he would argue shows that he is no more dangerous than a typical, law-abiding citizen. *See Binderup*, 836 F.3d at 376–78.  Moreover, to the extent that *Heller* is read as recognizing an unconditional right of self-defense, *see Binderup*, 836 F.3d at 344, Hunt Irving could also argue, as he did at his bail hearing, that he possessed the weapons for defense of his home and business in a high crime area.[14]  In short, if the concurrence in *Binderup* represented the rule in this circuit, Defendant would almost certainly be entitled to dismissal of the Indictment.

Against this background of uncertainty, the government sets out its disagreement with *Binderup*'s holding and divergent rationales.  In rebutting Hunt Irving's argument, the Government suggests that I consider his drug convictions in this case, and the underlying conduct leading up to these convictions, in evaluating whether he is the kind of person who is dangerous or a threat to society.[15]  This would require some form of judicial time travel, having the Court rule on the constitutionality of an April 2017 Indictment, based on a jury's verdict some two months later.  Moreover, "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process," *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001), making

---

[14] For that matter, a similar right to defend one's home could be asserted by his co-defendants, who rented residential properties used as a "stash house" and "lab" for cooking cocaine into crack as part of the overall conspiracy.

[15] *See, e.g.*, Gov.'s Resp. 9, 12, 14 n.8, 17, ECF No. 216 ("[Nothing] in [*Binderup*] suggests that the court would extend Second Amendment protection to convicted felons who soon after their felony convictions commit other serious felonies such as drug trafficking crimes.").

the Government's proposal even more problematic. The Government's need to resort to such an argument graphically underscores the difficulties that follow if indictments brought under § 922(g)(1) must be evaluated according to the accused's general worthiness to bear arms.

In this same worthiness analysis, the Government also asks that I attach significance to the fact that "firearms, of which AK-47 type assault rifles are especially nasty examples," are recognized tools of the drug trafficking trade. *See* Gov.'s Resp. 3 n.1, ECF No. 216. I am again concerned that the validity of the initial Indictment cannot and should not be evaluated by Defendant's subsequent drug trafficking conviction. As to the nature of the firearm, the weapon seized was not set to fully automatic, and in that respect is not different from other non-assault-style rifles. Thus, with the exception of Hunt Irving's prior felony, his possession of the rifle was lawful. I would note, however, that although not legally relevant to the validity of the Indictment, Defendant's possession of both weapons has relevance to the policy considerations served by § 922(g)(1). In *Binderup*, the Government presented various studies attempting to show that a person with a prior conviction is more likely to commit a subsequent offense than a member of the population at large. Neither the plurality nor the concurrence found them persuasive. What cannot be disputed, however, is that when recidivism *does* occur, it falls to law enforcement to respond, and given the legality and general availability of powerful weapons like assault-style rifles, whether a previously convicted felon has access to firearms has profound significance for agents executing an arrest warrant.[16]

---

[16] Although assault-style weapons such as AK47s must be set to semi-automatic to comply with federal law, the standard magazine allows the user to file thirty rounds in quick succession without stopping to reload. In addition to their large capacity, each bullet fired from an assault rifle has a high "wounding potential." Peter M. Rhee, MD, et al., *Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths*, 80 J. Trauma Acute Care Surg. 6 (2016). Wounding potential is measured as "muzzle energy," which is based on the bullet's weight and velocity. *Id.* A 144 grain bullet fired from an AK47 travels at a velocity of 2,749 feet per second, resulting in a muzzle energy of 2,437 feet per pound. *Id.* For comparison, a 9 mm handgun—a typical police weapon in this country—fires a 115 grain bullet at 1,200

Returning to *Binderup*, it is clear that *Marzzarella*'s two-step analysis remains controlling in the Third Circuit, albeit with some uncertainty in its application. Under step one, a court must first determine if the statute in question burdens conduct within the scope of the Second Amendment's guarantee. 614 F.3d at 89. If it does not, the court need go no further. *Id.* *Marzzarella* clearly reads *Heller* as having held that felons fall outside the protection of the Second Amendment. *Id.* at 91–92.

But my inquiry does not end there. That is so because, even though no definitive test emerged from *Binderup*, the majority that endorsed *Marzzarella* as the controlling case was comprised of seven judges from the dissent and three from the plurality. And although these ten judges endorsed *Marzzarella's* two-step test, they would apply it differently. The three judges from the plurality would entertain the possibility that even a felon might retain Second Amendment rights under certain, unspecified circumstances. As a result, Hunt Irving's argument could be said to fall within the plurality's approach as well as that of the concurrence. This difference, embodied in the plurality's conclusion as step "5", *id.* at 356, appears to require separate consideration of whether a felony conviction like Hunt Irving's was "serious" for Second Amendment purposes. I therefore return to the plurality's approach, to determine if Defendant's felony conviction for records tampering presents the "remote" scenario the three-judge plurality contemplated as an exception to the general rule that felons may not possess guns.

Preliminarily, I find some ambiguity in the plurality's model. Presumably, if the

---

feet per second, yielding a muzzle energy of 400 feet per pound. Thus, the wounding potential from a single bullet fired from an AK47 is more than six times that of a bullet fired from a handgun. In addition, the higher velocity of military style weapons results in a greater incidence of bullet fragmentation, which is associated with greater tissue damage. Jowan G. Penn-Barwell et al., *High Velocity Gunshot Injuries to the Extremities: Management on and off the Battlefield*, 8(3) Current Revs. in Musculoskeletal Med. 312, 313 (2015) (U.K.); Vichan Peonim, MD, et al., *Entrance and Exit Wounds of High Velocity Bullet: An Autopsy Analysis in the Event of Dispersing the Mass Rally in Bangkok Thailand*, May 2010, 23 J. Legal Med. 10, 14–15.

underlying offense had a violent element, it would represent a "serious" crime without further analysis. The plurality appears to suggest that this requires a categorical analysis, borrowing concepts from the Supreme Court's jurisprudence under the Armed Career Criminal Act, which focuses on the elements of an offense rather than the way it was committed. *Id.* at 352 & n.4 (citing *United States v. Skoien,* 614 F.3d 638, 642 (7th Cir. 2010), which, in rejecting a challenge to § 922(g)(9)'s prohibition on gun ownership for people convicted of "misdemeanor crime[s] of domestic violence," applied the categorical approach as expressed in ACCA cases). Simultaneously, however, it observes: "[t]hough, as explained, it is possible for non-violent crimes to be serious, the lack of a violent element is a relevant consideration," noting on the same page that the length of sentence is relevant. *Id.* at 352. To what then, should the court look in determining the seriousness of non-violent crimes? If the approach is categorical, does it look to the other elements of the underlying offense in determining seriousness? And if so, to what characteristics should the court look in analyzing those elements? Suffice it to say that analyzing the elements of a statute to determine whether they encompass violent conduct focuses on a far more specific question then a consideration of "seriousness."

Under the Pennsylvania statute that criminalizes tampering with public records, different potential sentences apply depending upon the nature of the defendant's conduct. The statute specifically provides that the crime is generally a second degree misdemeanor punishable by no more than two years' imprisonment. 18 Pa. Cons. Stat. §§ 4911(b), 1104(2). But if "the intent of the actor is to defraud or injure anyone," the offense converts to a third degree felony and the maximum sentence jumps to seven years. §§ 4911(b), 1103(3). Here, Hunt Irving pleaded guilty under the felony portion of the statute, because his violation was not simply technical in nature, but rather was done with the intent to defraud. Proceeding categorically (to the extent it is

possible to do so), it seems clear that the additional element required to elevate the charge to a felony—an intent to harm third parties—represents a determination by the Pennsylvania legislature that such conduct is objectively more serious.

As to the sentence imposed for his prior offense, a consideration which the plurality deems relevant, Hunt Irving argues that the lack of jail time counts against the seriousness of his offense. Given his subsequent criminal conduct, little weight should be placed on the leniency of the prior sentencing court. Putting to one side the realities of plea bargaining, a judge imposing a lenient sentence for a first offender acts in part on an assumption that the defendant's law-breaking was an aberration. Binderup and Suarez vindicated the confidence shown by their sentencing courts; Hunt Irving has not. Although I have rejected the Government's argument that Defendant's later conviction on the drug conspiracy necessarily validates the gun charge in the Indictment, I need not ignore it in deciding how much significance to attach to his prior sentence. [17]

Furthermore, to the extent that it is proper for me to make an independent determination of the nature of Defendant's conduct, as the district courts did for both Binderup and Suarez, *see* 836 F.3d at 352 n.4, I find it significant that Hunt Irving's unlawful acts came at the expense of victims of violence who were entitled to payments from Pennsylvania's Victims Compensation program. It was a crime that was both calculated and callous—calculated because it required the deliberate manipulation of claims to the Commonwealth, and callous because it victimized families who had lost loved ones to violence.

In conclusion, as a felon convicted of a serious crime, Hunt Irving fell outside the protection of the Second Amendment, and his indictment under § 922(g)(1) was lawful.

---

[17] This case is unique in that Hunt Irving's gun charge was severed from the drug charges for trial, so I now know definitively that Hunt Irving's prior criminal conduct was not an aberration. In a typical case, charges that have not resulted in a conviction would not be considered.

## IV. Interstate Commerce

When Hunt Irving originally filed his Motion to Dismiss the Indictment in 2015, he argued that the Indictment did not adequately allege that the firearms in question had travelled in interstate commerce, one of the requirements of § 922(g)(1). Although he has not returned to that argument in subsequent briefing, in the event that he has not dropped that challenge, it is now denied. The Indictment alleges that the firearms in question were knowingly possessed "in and affecting interstate and foreign commerce." Indictment 9, ECF No. 154. The Third Circuit has already upheld the sufficiency of nearly identical language, without more. In *United States v. Huet*, 665 F.3d 588, 596 (3d Cir. 2012), the court reviewed a § 922(g)(1) charge, holding that the indictment's use of the phrase "in and affecting interstate commerce" was adequate under Fed. R. Crim. P. 7(c)(1).

## V. Multiplicity

In December 2017, months after his trial had concluded, Hunt Irving raised a multiplicity challenge to the Indictment for the first time. *See* Def.'s Mot. 13–14, ECF No. 217. Under Federal Rule of Criminal Procedure 12, motions based on "a defect in the indictment," including multiplicity, "must be raised by pretrial motion if the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3). Hunt Irving's multiplicity challenge therefore appears untimely, and, although Rule 12(d) authorizes a court to consider an untimely motion if the defendant shows good cause, Hunt Irving has not even attempted to make a showing of good cause here. I nevertheless review it on the merits.[18]

Multiplicity is "the charging of a single offense in separate counts of an indictment." *United States v. Kennedy*, 682 F.3d 244, 254 (3d Cir. 2012). The risk of multiplicitous

---

[18] It is not clear whether Defendant is arguing that Counts One and Two are multiplicitous and/or that Counts One and Eight are. *See* Mot. New Trial 13. For this analysis, I assume that he seeks to challenge both.

indictments is that defendants will be subject to multiple sentences for the same offense, an "obvious violation" of the Double Jeopardy Clause. *Id.* at 255. The Supreme Court has held that, "because the substantive power to prescribe crimes and determine punishments is vested with the legislature, whether punishments are 'multiple' is essentially one of legislative intent." *Ohio v. Johnson*, 467 U.S. 493, 499 (1984).

To evaluate legislative intent, the Third Circuit usually applies the test from *Blockburger v. U.S.*, 284 U.S. 299, 304 (1932), a double jeopardy case.[19] *United States v. Hodge*, 870 F.3d 184, 194 (3d Cir. 2017); *accord United States v. Bencievengo*, 749 F.3d 205, 215 (3d Cir. 2014). The test asks "whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. If the latter, there can be but one penalty." *Blockburger*, 284 U.S. at 302. This test determines whether each offense contains an element of required proof that the other offense does not, and is also called the "same-elements test." *United States v. Dixon*, 509 U.S. 688, 696 (1993); *see also* Wright et al., *Federal Practice and Procedure* § 142 n.15 (4th ed. 2018).

Applying *Blockburger* to Hunt Irving's conspiracy and attempt charges (Counts One and Two), I conclude that they are not multiplicitous. The elements of conspiracy require proof of "a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and *an agreement* to work together toward that goal." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (emphasis added) (citing 21 U.S.C. § 846). Attempt, on the other hand, "requires the specific intent to commit a crime . . . and *a substantial step* towards the commission of that

---

[19] Although *Blockburger* is the prevailing test, the Third Circuit occasionally analyzes double jeopardy claims without explicitly applying *Blockburger*'s elements test and instead focuses on evidence. *See, e.g.*, *United States v. Stanfa*, 685 F.2d 85, 88 (3d Cir. 1982) (explaining that "two counts are multiplicitous if the evidence shows that exactly the same facts that would make out one violation also would make out the other"). Hunt Irving's challenge would likewise fail under this evidence-based test, as the jury could have convicted him on separate accounts of attempt and conspiracy without relying on the same evidence twice, and, in any case, he failed to request a jury instruction requiring them to do so. *See id.* at 88.

crime." *United States v. Pavulak*, 700 F.3d 651, 669 (3d Cir. 2012) (emphasis added). Each requires proof of an element that the other does not, and each is therefore separately punishable.

Turning to Hunt Irving's two conspiracy charges (Counts One and Eight), a slightly different test for multiplicity is appropriate. The Third Circuit has held that, to protect the interest of defendants, courts reviewing conspiracy counts for multiplicity should apply the four-part, totality of the circumstances test from *United States v. Liotard*, 817 F.2d 1074, 1078 (3d Cir. 1987). *United States v. Fumo*, 2008 WL 1731911, at *3 (E.D. Pa. 2008); *see also United States v. Smith*, 82 F.3d 1261, 1267 (3d Cir. 1996) (applying *Liotard* to evaluate a double jeopardy challenge to conspiracy charges). A defendant makes out a *Liotard* challenge if he can show (a) that the place of the alleged conspiracies is the same; (b) that their degree of temporal overlap is significant; (c) overlap of the people involved, including unindicted co-conspirators; and (d) similarity in the overt acts charged and role allegedly played by the defendant in each. 817 F.2d at 1078.

Here, Hunt Irving cannot meet this burden, despite the similarity in the charged conspiracies, because there is little or no temporal overlap. The Indictment alleged that both conspiracies occurred in Chester, with Count One reaching Philadelphia, as well. Indictment at 1, 17. Although the dates in the indictment are only approximate, there is no temporal overlap: the first conspiracy (Count One) concluded on February 23, 2014, when Hunt Irving allegedly called Defendant Church to check on the Federal Express package, and the second conspiracy (Count Eight) began the following month, when Hunt Irving discussed with Defendant Pinkney a scheme to secure a new source of cocaine from California. *See id.* at 4, 18. Defendants Church and Pinkney are named in both conspiracies along with Hunt Irving, but Defendants Beauford and Mills were allegedly involved only in the first. Lastly, the role Hunt Irving allegedly played

in each is similar: discussing the plan with his co-defendants and agreeing to send money toward the purchase of drugs. But the lack of temporal overlap is controlling here, because even similar acts taken as part of a conspiracy "cannot be the same since they occurred at different times." *See United States v. Yahsi*, 2013 WL 588178 (D.N.J. 2013), *aff'd* 490 F. App'x 476, 478 (3d Cir. 2012); *accord United States v. Becker*, 892 F.2d 265, 269 (3d Cir. 1989) ("[T]he guarantee against double jeopardy does not insulate a criminal for subsequent offenses merely because he chooses to continue committing the same type of crime."). Accordingly, I hold that Counts One and Eight are not multiplicitous.

## VI. Rule 33

Finally, Hunt Irving asks the Court to arrest judgment on Counts One, Two, and Eight and grant a new trial under Federal Rule of Criminal Procedure 33. Mot. New Trial 14–15. Rule 33(a) allows courts to "vacate any judgment and grant a new trial if the interest of justice so requires." As the Third Circuit explained:

> A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted. Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case.

*United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citations omitted).

As a preliminary matter, it appears that this argument, too, is time-barred. Rule 33 requires all motions, other than those based on newly discovered evidence, to be filed within fourteen days of the verdict. However, timeliness aside, Hunt Irving's claim would fail on the merits. Exercising my own judgment, having presided over Hunt Irving's ten-day trial, which included extensive wiretap evidence, I conclude that justice does not require a new trial. His all-consuming interest in the Federal Express package intercepted by federal agents was compelling

evidence of his participation in the conspiracy to import the drugs it contained, and his explicit discussion of the need to find a new source, captured on a wiretap, was equally compelling. There is no danger that a miscarriage of justice has occurred.

## VII. Conclusion

Defendant Hunt Irving's Motion to Dismiss the Indictment and Motion for a New Trial are denied, and the felon-in-possession charge, Count Six, stands.


                                                    _____/s/ Gerald Austin McHugh
                                                    United States District Judge